IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| TERILE L. GARCIA, | CV 16-157-BLG-TJC |
| Plaintiff, | |
| vs. | **ORDER** |
| NANCY A. BERRYHILL, Acting Commissioner of the Social Security Administration, | |
| Defendant. | |

On November 3, 2016, Plaintiff Terile L. Garcia ("Plaintiff") filed a complaint pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner") regarding the denial of Plaintiff's claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, 1381-1383f. (Doc. 2.) The Commissioner filed an Answer and the Administrative Record ("A.R.") on January 9, 2017. (Docs. 10, 11.)

Presently before the Court is Plaintiff's motion for summary judgment, seeking reversal of the Commissioner's denial and remand for an award of

disability benefits.  (Doc. 13.)  The motion is fully briefed and ripe for the Court's

review.  (Docs. 17, 20.)

For the reasons set forth herein, and after careful consideration of the record

and the applicable law, the Court orders as follows.

## I.  PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB and SSI benefits in July 2013.  (A.R.

186-201.)  Plaintiff alleges she has been unable to work since November 12, 2012.[1]

(A.R. 17; Doc. 13 at 1.)  The Social Security Administration denied Plaintiff's

application initially on October 21, 2013, and upon reconsideration on April 9,

2014.  (A.R. 129-131, 135-139.)  On May 12, 2014, Plaintiff filed a written request

for a hearing.  (A.R. 140-141.)  Administrative Law Judge Michele M. Kelley (the

"ALJ") held a hearing on April 14, 2015.  (A.R. 39-82.)  On June 5, 2015, the ALJ

issued a written decision finding Plaintiff not disabled.  (A.R. 12-38.)  Plaintiff

requested review of the decision on August 11, 2015.  (A.R. 10-11.)  The ALJ's

decision became final on September 8, 2016, when the Appeals Council denied

---

[1] Plaintiff's initial application provided an alleged onset date of January 1, 2011.
(A.R. 193.)  Plaintiff amended the alleged onset date to November 12, 2012, in a
letter from counsel dated April 13, 2015.  (A.R. 215.)  There appears to be no
dispute between the parties that November 12, 2012, is the operative alleged onset
date.

Plaintiff's request for review.  (A.R. 4-9.)  Thereafter, Plaintiff filed the instant action.

## II.     LEGAL STANDARDS

### A.     Scope of Review

The Social Security Act allows unsuccessful claimants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C. §§ 405(g), 1383(c)(3).  The scope of judicial review is limited.  The Court must affirm the Commissioner's decision unless it "is not supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  *See also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may reverse the ALJ's decision to deny benefits only if it is based upon legal error or is not supported by substantial evidence."); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

"Substantial evidence is more than a mere scintilla but less than a preponderance."  *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)).  "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."  *Flaten*, 44 F.3d at 1457.  In considering the record as a whole, the Court must weigh both the evidence that supports and detracts from the

ALJ's conclusions. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)). The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."); *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary."). However, even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a conclusion. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968)).

### B.     Determination of Disability

To qualify for disability benefits under the Social Security Act, a claimant must show two things: (1) she suffers from a medically determinable physical or mental impairment that can be expected to last for a continuous period of twelve months or more, or would result in death; and (2) the impairment renders the claimant incapable of performing the work she previously performed, or any other

substantial gainful employment which exists in the national economy. 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A). A claimant must meet both requirements to be classified as disabled. *Id*.

The Commissioner makes the assessment of disability through a five-step sequential evaluation process. If an applicant is found to be "disabled" or "not disabled" at any step, there is no need to proceed further. *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005) (quoting *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 974 (9th Cir. 2000)). The five steps are:

1. Is claimant presently working in a substantially gainful activity? If so, then the claimant is not disabled within the meaning of the Social Security Act. If not, proceed to step two. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe? If so, proceed to step three. If not, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1? If so, then the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

Although the ALJ must assist the claimant in developing a record, the claimant bears the burden of proof during the first four steps, while the Commissioner bears the burden of proof at the fifth step. *Tackett v. Apfel*, 180 F.3d 1094, 1098, n.3 (citing 20 C.F.R. § 404.1512(d)). At step five, the Commissioner must "show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id*. at 1100 (quoting 20 C.F.R. § 404.1560(b)(3)).

## III.    FACTUAL BACKGROUND

### A.    The Hearing

A hearing was held before the ALJ on April 14, 2015, in Billings, Montana, and the following testimony was provided.

#### 1.    Plaintiff's Testimony

Plaintiff testified that she lives by herself in an underground house in Billings, Montana. (A.R. 47.)

She has a past employment history as a ward clerk. (A.R. 47.) She quit because she began forgetting important things, such as a patient's low blood

pressure. (A.R. 47-48.) She then worked part-time as a janitor at a bank, but quit that job because she was getting short of breath and had sciatic pain. (A.R. 48-49.)

Plaintiff testified that she could walk two to three blocks prior to an injury to her ankle. (A.R. 49-50.) She stated that she can stand for only a few minutes at a time, although she later testified that she "tr[ies] to stay on [her] feet because it's better." (A.R. 50-51, 66.) She reported that she can lift 10-15 pounds, although the only medical restriction she could recall limited her lifting to less than 25 pounds. (A.R. 51-52.) She testified that, after lifting heavy objects, "sometimes my arm kinks up," and she "can't move it for a couple weeks." (A.R. 52.) She testified that her shoulders hurt "all the time," and that she does not sleep with a pillow for that reason. (A.R. 53.) She reported that her children do almost all of her household chores, with the noted exceptions of drying dishes and watering plants. (A.R. 53-54.) She does not cook because she has left the burner on in the past. (A.R. 60.) Upon questioning from the ALJ, Plaintiff stated she never goes shopping, and that her sister and her children do all of her shopping. (A.R. 69.)

Plaintiff stated that she has difficulty bending at the waist, due to pain in her hips and lower back; difficulty bending at the knees; difficulty twisting; difficulty pushing and pulling; and difficulty with fine motor movements, such as buttoning her shirt. (A.R. 54-55.) Plaintiff testified that she "tr[ies] not to hold anything,"

due to resulting pain in her hands.  (A.R. 55.)  Her hands and feet sometimes swell, and her feet sometimes go numb.  (A.R. 56.)  She testified that she falls "a couple times a week."  (A.R. 57.)

Plaintiff's attorney asked her about "talk in the records about you having something that you call a spell."  (A.R. 58.)  Plaintiff testified that a "spell" is blacking out all of the sudden, which is what causes her to feel like she may fall. (A.R. 58-59.)  She quit driving due to these spells.  (A.R. 59.)

Plaintiffs testified that she misses appointments frequently.  When asked why, she responded, "I just miss them.  I don't mean to.  I write them down, but then I forget that I write them down."  (A.R. 60.)  She also forgets to take her medications "[a] few times a week."  (A.R. 60.)

Plaintiff reports having panic attacks as frequently as twice per day, although at the time of the hearing, she was only experiencing them once or twice per month.  (A.R. 61-62.)  She suffers from anxiety that she said increased following her heart attack.  (A.R. 62.)

Plaintiff's attorney questioned her about records indicating that RiverStone Health "had wanted to refer [her] for some neuropsych testing," but that she did not go.  (A.R. 63-64.)  Plaintiff stated that she could not afford it.  (A.R. 64.) RiverStone also apparently discussed with Plaintiff meeting with a counselor.

Plaintiff responded that she "thought they called – they were supposed to make an appointment and they didn't," she thinks, although she admitted later that she does not remember.  (A.R. 64.)

Plaintiff testified that "the biggest issue keeping [her] from working" is her "body not working right."  (A.R. 64.)  Specifically, she identified her back, legs, and memory.  (A.R. 64-65.)  Plaintiff has good days and bad days.  She testified that a bad day is "just lying in bed, not getting up," and that those occur two to three times per week.  (A.R. 65.)

Plaintiff also testified that her feet swell "maybe a couple times every two weeks," and she is forced to lay down and elevate her feet above her heart for "a couple hours."  (A.R. 65-66.)  She smokes six cigarettes per day, down from a pack per day.  (A.R. 66.)

The ALJ questioned Plaintiff about records dating from the summer of 2013 indicating that she swims three times per week at her sister's house.  (A.R. 67.)  Plaintiff testified that she stopped because she could not get up the ladder.  (A.R. 67.)  The ALJ also questioned Plaintiff regarding records indicating that she was in Minnesota caring for her mother for much of 2012.  Plaintiff testified that she does not remember that, and "[doesn't] think" that she was just making up the

Minnesota tenure for an excuse as to why she had not been going to her appointments.  (A.R. 67-68.)

## 2.    Vocational Expert's Testimony

Delane Hall, a Vocational Expert (the "VE"), also testified before the ALJ. (A.R. 71-81.)  The VE noted that Plaintiff performed the jobs of ward clerk (specific vocational preparation ("SVP") of 3 and physical demand light) and certified nurse's aide (SVP of 4 and physical demand of medium, though Plaintiff described it as heavy) from 1991 to 2009.  (A.R. 72.)  Plaintiff described it as one "combined job," explaining that "you're hired as a CNA but you're also a ward clerk and aide."  (A.R. 72-73.)  The VE then noted that from December 2010 to October 2012, Plaintiff worked part-time as a housekeeper (SVP of 2, physical demand light).  (A.R. 73.)  The VE stated that Plaintiff has obtained skills including telephone skills, recording information into computers or logs, some ordering, and some scheduling.  (A.R. 73.)

The ALJ asked the VE whether there are "any semi-skilled jobs of an equal to or less skilled level than the jobs that those skills were derived from."  (A.R. 73.)  The VE listed the following jobs: telephone answering service operator, appointment clerk, and personnel scheduler.  (A.R. 74.)

Next, the ALJ asked the VE three hypothetical questions.  First, the ALJ asked the VE to assume an individual with the following characteristics: the same past jobs as Plaintiff; limited to lifting and carrying, pushing and pulling 10 pounds frequently and 20 pounds occasionally; walking and standing six hours in an eight-hour workday; sitting six hours in an eight-hour workday; able to change positions during normal work breaks; can frequently climb ramps and stairs, balance, kneel, crouch, and crawl; can occasionally climb ladders, ropes, and scaffolds, and stoop; and should avoid concentrated exposure to extreme cold, vibrations, fumes, odors, dusts, gases, poor ventilation, and work hazards including uneven surfaces, unprotected heights, and dangerous machinery.  (A.R. 74-75.)  The VE said the individual would be able to perform Plaintiff's past job ward clerk, except that Plaintiff could not perform the last job she described which was a combination of ward clerk and certified nurse's aide.  (A.R. 75.)  The VE said the individual could also perform the jobs of telephone answering service operator, appointment clerk, and personnel scheduler.  (A.R. 75.)

Second, the ALJ asked the VE to assume the same person, but with the additional limitations of lifting, carrying, pushing, and pulling a maximum of 10 pounds; walking and standing a maximum of four hours out of an eight-hour workday; and can only occasionally reach overhead with the bilateral upper

extremities.  (A.R. 76.)  The VE said the individual would be able to perform all of the jobs identified in the first hypothetical.  (A.R. 76-77.)

Third, the ALJ asked the VE to assume an individual with the same past work history as Plaintiff, who is of a similar age, and has a similar educational background, but who would be off-task consistently 20 percent of an eight-hour workday and 40-hour week.  (A.R. 77.)  The VE said there were no jobs in the national economy available for such an individual.  (A.R. 77-78.)

Upon questioning from Plaintiff's counsel, the VE stated that the following hypothetical conditions would eliminate the jobs he identified: if the individual could only perform fine motor skills occasionally; if panic attacks routinely forced the individual to leave her job for a half-hour or more; and if the individual needed to be in a reclined position so as to elevate her legs above her heart.  (A.R. 79-80.)  Plaintiff's counsel also brought up Plaintiff's history of "forgetting to put things in people's charts or making mistakes on her entries" and asked the VE how many times those mistakes would be tolerated.  (A.R. 80.)  The VE answered that it would depend on the policy of the individual workplace, but that usually the first time would result in a verbal warning, the second time would result in a written warning, and the third time would result in dismissal.  (A.R. 80.)

**B.    Medical Evidence**

The A.R. also includes the following pertinent medical records.  Additional records may be discussed below as appropriate.

**1.    Treating Physician Evidence**

**a.    Samuel L. Paczkowski, MD**

Dr. Paczkowski is an emergency medicine doctor at St. Vincent Healthcare who treated Plaintiff in December of 2012.  Dr. Paczkowski's initial note on December 17, 2012, explains that Plaintiff reported to Billings Clinic three days prior and was diagnosed with new-onset congestive heart failure and pneumonia, but left against medical advice due to disagreement with staff.  (A.R. 323.) Plaintiff reported to the emergency room at St. Vincent due to swelling in her lower extremities and shortness of breath; Dr. Paczkowski noted that she "does not appear to be in distress."  (A.R. 323.)  Dr. Paczkowski admitted Plaintiff to the hospital for treatment of pneumonia, evaluation of lower extremity edema, and elevated troponin.  (A.R. 326.)

On December 22, 2012, Plaintiff "was taken to the operating room where under general anesthesia and cardiopulmonary bypass, she underwent aortic valve replacement using a 25 mm mosaic bovine pericardial valve."  (A.R. 332.)

Plaintiff had no significant postoperative complications and was discharged on December 26, 2012.

Dr. Paczkowski saw Plaintiff again on July 3, 2013, when she reported to the emergency room for shortness of breath.  (A.R. 406-410.)  He wrote that she did not appear to be in any acute distress, and she denied pain, lower-extremity swelling, and dizziness.  (A.R. 406.)  Dr. Paczkowski noted Plaintiff's anxiety, gave her Ativan and a breathing treatment, and discharged her.  (A.R. 408.)

### b.    Adam Stenseth, MD

Dr. Stenseth screened Plaintiff for depression on January 28, 2013, and found her to be moderately depressed.  (A.R. 470-473.)  He noted that she has been agitated intermittently at small things and is easily angered and upset, but that she reports that she "[d]oesn't feel that depressed."  (A.R. 470.)  Plaintiff reported that she did not have trouble concentrating on things.  (A.R. 470.)

On February 26, 2013, Dr. Stenseth documented that Plaintiff had moderately severe depression.  (A.R. 466-469.)  She reported that she had trouble concentrating more than half of days.  (A.R. 466.)  Dr. Stenseth noted that Plaintiff had stopped taking her Prozac.  (A.R. 468.)

On March 15, 2013, Dr. Stenseth documented that Plaintiff scored for moderate depression.  (A.R. 462-465.)  However, he noted that Plaintiff denied

being depressed, was "not feeling depressed," and "finds joy in taking care of grandchildren." (A.R. 462.) She reported that she had trouble concentrating for several days. (A.R. 462.)

Plaintiff saw Dr. Stenseth on April 19, 2013, for an unremarkable "wellwoman"/pap smear appointment. (A.R. 456-459.) Pertinent, however, is that although Plaintiff contends Dr. Stenseth "found [she] had severe anxiety" at this appointment (*see* Doc. 13 at 12), the Court can locate no such finding. Rather, Dr. Stenseth noted that Plaintiff "complains of severe anxiety" and scheduled an anxiety appointment for her. (A.R. 456.) To the extent that Dr. Stenseth made any psychiatric findings at this appointment, he noted that Plaintiff's affect and grooming were appropriate, her mood was normal and pleasant, and her eye contact was normal. (A.R. 459.)

On May 1, 2013, Dr. Stenseth documented that Plaintiff had scored for moderate depression. (A.R. 452-455.) (A.R. 452.) Again, however, he noted that Plaintiff "doesn't feel like she is depressed now," "isn't interested in behavioral health," and is "[n]ot interested in starting any medications for depression or anxiety." (A.R. 452.) Dr. Stenseth counseled Plaintiff "about the positive effects of exercise on depression/anxiety." (A.R. 454.) Plaintiff indicated that Trazadone was effective in managing her insomnia. (A.R. 454.)

On July 30, 2013, Plaintiff again scored for moderate depression. (A.R. 438-441.) Plaintiff reported at that appointment that she "[f]eels like she may be depressed." (A.R. 438.) Dr. Stenseth prescribed citalopram for depression and anxiety. (A.R. 440.)

On September 13, 2013, Plaintiff scored for severe depression. (A.R. 433-437.) Plaintiff reported that she "doesn't feel depressed but just tired." (A.R. 433.) Dr. Stenseth increased Plaintiff's citalopram dosage, and indicated that she "has seen behavioral health previously but [is] not interested at this time." (A.R. 436.)

On October 29, 2013, Plaintiff again scored for severe depression. (A.R. 544-548.) Plaintiff reported that she does not have any energy and "[d]oesn't really have any joy in her life." (A.R. 544.) Dr. Stenseth noted that Plaintiff "[d]oes occasionally have anxiety but only rarely uses the hydroxyzine" despite that it "is effective at decreasing her anxiety." (A.R. 544.) Dr. Stenseth also noted that Plaintiff was diagnosed with a prolapse of female pelvic organs (*see* A.R. 549-553), but that Plaintiff "feels like it is getting better and is not bothered by this" and "does not want any further workup at this time." (A.R. 547.)

On December 18, 2013, Plaintiff again scored for severe depression. (A.R. 554-557.) Plaintiff's medication was not altered, and she expressed interest in behavioral health. (A.R. 556.)

On May 13, 2014, Plaintiff again scored for severe depression.  (A.R. 558-562.)  Dr. Stenseth's note indicates that Plaintiff "reports depression unchanged from previous and is not willing to switch any antidepressants or try any new treatments at this time" and "sometimes forgets to take meds."  (A.R. 558.)  Dr. Stenseth recorded that Plaintiff's memory problems had been worsening over the prior three months.  (A.R. 559.)  He referred her for an MRI "to rule out any obvious brain pathology."  (A.R. 561.)

On July 8, 2014, Plaintiff again scored for severe depression.  (A.R. 563-566.)  Plaintiff could not tolerate the MRI due to the confined space and refused to retry, "even with possible sedation."  (A.R. 563.)  Dr. Stenseth referred her to neuropsych testing to address her memory issues.  (A.R. 565.)

On November 20, 2014, Plaintiff again scored for severe depression.  (A.R. 567-571.)  Plaintiff reported that she sometimes feels like she would be better off dead, but had not had any suicidal plans.  (A.R. 567.)  She reported no anxiety issues at that time.  (A.R. 567.)  Dr. Stenseth switched Plaintiff from Citalopram to Prozac to treat her depression.  (A.R. 570.)

On December 20, 2014, Plaintiff again scored for severe depression, although Dr. Stenseth assessed her as having moderate depression.  (A.R. 572-

574.)  Plaintiff reported a "positive difference since starting the Prozac."  (A.R.

572.)  Dr. Stenseth increased her Prozac dosage.  (A.R. 574.)

On January 8, 2015, Plaintiff again scored for severe depression, although

Dr. Stenseth assessed her as having moderate depression.  (A.R. 575-578.)

Another provider (Wade King, discussed below) referred Plaintiff for an MRI to

assess her cervical spine, and she requested anxiety medication to help her get

through that treatment.  (A.R. 575.)  Plaintiff also requested a higher dosage of her

sleep medication.  (A.R. 575.)

On January 19, 2015, Plaintiff scored for moderately severe depression,

although Dr. Stenseth assessed her as having moderate depression.  (A.R. 579-

581.)  Plaintiff reported a small benefit from Prozac, and was more active and

eating more.  (A.R. 579.)  Dr. Stenseth increased her Prozac dosage, and referred

her to behavioral health.  (A.R. 581.)

On February 24, 2015, Plaintiff again scored for severe depression, although

Dr. Stenseth assessed her as having moderate depression.  (A.R. 572-574.)

### c.  Matthew Westmark, MD

Dr. Westmark treated plaintiff for anxiety and a panic attack on July 9, 2013.

(A.R. 442-445.)  He gave her Ativan and a breathing treatment, and ordered a chest

x-ray which did not show any acute abnormality.  (A.R. 442.)  He noted that she

"ran out of her albuterol yesterday, which may be contributing to her symptoms."
(A.R. 442.) Plaintiff declined medication for anxiety and depression, but said she
was willing to work with behavioral health. (A.R. 444.)

### d. Erin Burke, MD

Dr. Burke treated Plaintiff on October 17, 2013, for a bulge in Plaintiff's
vagina. (A.R. 549-553.) Dr. Burke diagnosed Plaintiff with prolapse of female
pelvic organs. (A.R. 551.) Plaintiff refused physical therapy due to expense, and
Dr. Burke recommended Kegel exercises. (A.R. 551.) As noted above, Plaintiff
reported at her next appointment with Dr. Stenseth that she "feels like it is getting
better and is not bothered by this" and "does not want any further workup at this
time." (A.R. 547.)

### e. Michael Yorgason, MD

Dr. Yorgason treated Plaintiff in March of 2015 for a leg injury. (A.R. 618-
623.) He diagnosed her with a displaced left ankle fracture, and noted that she is a
heavy smoker with a history of poor self-care. (A.R. 619.) He surgically repaired
her fracture, placing a lateral plate and screws in her ankle. (A.R. 620.) Plaintiff
reported back to Dr. Yorgason approximately two weeks post-operation. He
explained to her that her continued smoking "may lead to delayed healing or lack
of healing as well as increased risk of infection." (A.R. 622.) Plaintiff was not

interested in smoking cessation assistance.  (A.R. 622.)  Dr. Yorgason removed

Plaintiff's cast and replaced it with a thickly padded cast, reinforced for weight-

bearing, although he advised against weight-bearing.  (A.R. 622.)

### 2.    Treating Other Source Evidence

### a.    Wade King, MN, NP-C

King is a certified nurse practitioner who treated Plaintiff for chronic pain

management, beginning in September of 2010.  (A.R. 395.)  A record generated on

November 12, 2012 (which is the operative alleged onset date), notes that King had

diagnosed Plaintiff with generalized myofascial pain consistent with fibromyalgia,

chronic low-back pain, generalized osteoarthritis at multiple sites, and cervical

pain.  (A.R. 383-384.)  Plaintiff reported on November 12, 2012, that "it is

becoming more and more difficult for her to work."  (A.R. 383.)  King wrote that

he "once again…indicated to her that the only way to help us define what might be

wrong [with her low-back and cervical pain issues] would be to get some updated

imaging," but Plaintiff declined due to cost.  (A.R. 383.)  Regarding Plaintiff's

financial concerns, King noted that "[c]ertainly she can apply for patient assistance

through St. Vincent Healthcare.  She has been offered that opportunity in the past.

It is not clear why she did not complete the application."  (A.R. 383.)  King

prescribed extended-release morphine and continued oxycodone.  (A.R. 383.)

Plaintiff returned to King on March 12, 2013. (A.R. 381-382.) She indicated to King that she was "doing much better" since the aforementioned heart surgery. Regarding her pain medication, she reported to King that "the pain medications do allow her the opportunity to continue to work and without them she feels it would be unlikely she would be able to work." (A.R. 381.) King noted "that the pain medications also improve her life by allowing her to maintain her independent living status and function as a community ambulator." (*Id.*)

Plaintiff returned to King on June 4, 2013, for a routine pain management appointment. (A.R. 379-380.) She indicated that she was having more difficulty working and was considering applying for disability. King noted that he "would want to get some updated imaging of her spine to help me identify whether or not she has significant pain generators that would make it reasonable to consider [d]isability," but that "[s]he certainly is not capable, likely, of heavy physical work such as working as a CNA as she had in the past." (A.R. 379.) Plaintiff denied being depressed, but indicated that "she does have some anxiety." (A.R. 379.)

On October 14, 2013, Plaintiff indicated that the cold weather and barometric pressure changes made her pain worse. (A.R. 587.) Though Plaintiff reported having some bad days that required her to remain home, "for the most part

she gets by adequately well." King noted that Plaintiff's depression was well-managed. He did not adjust any of her medications. (A.R. 587-588.)

Plaintiff did not report any significant changes on February 13, 2014, although she was suffering from a stomach illness. (A.R. 589-590.)

On March 26, 2014, Plaintiff reported that her pain had increased due to her illness and the weather. (A.R. 591.) She reported her pain as a 10 out of 10, which King believed to be "somewhat of an exaggeration." (A.R. 591.) He did not adjust any of her medication. She complained that her depression was not being well-managed, and King encouraged her to follow up with her primary care provider. (A.R. 591.)

Plaintiff indicated worsening pain in her neck and back on June 17, 2014. (A.R. 592.) A "physical examination did not identify any emergent problems." King recommended an update to the most-recent 2005 imaging, but Plaintiff again refused due to financial constraints. (A.R. 592.) King did not adjust her medication, and he encouraged her to stop smoking. He noted that Plaintiff does not believe she can return to work, and "certainly physical labor is beyond her." (A.R. 592.)

Plaintiff reported on October 14, 2014, that she was "getting by adequately well," although her cervical pain was increasing. (A.R. 595.) She explained that

her primary care provider had made arrangements for patient assistance through Billings Clinic.  No changes were made to her medication.  (A.R. 595-598.)

Plaintiff reported a worsening condition on January 8, 2015, complaining of left upper extremity radiculitis and "almost unbearable" cervical pain.  (A.R. 600.) Plaintiff indicated her pain is a 10 out of 10.  (A.R. 601.)  King believed that Plaintiff's "perception [of her] pain is likely complicated by ongoing upper respiratory infection."  (A.R. 600.)  He did not change her medication and noted that her depression was well-managed.  (A.R. 600.)  King ordered an MRI of Plaintiff's cervical spine, which was performed on January 26, 2015.  (A.R. 604-605.)  The MRI revealed no central cord compression, but confirmed "multilevel spondylosis which does not appear to be significantly changed from the prior study" and "severe facet degeneration" at C4-C5.  (A.R. 604-605.)  Notes indicate that Plaintiff's obesity complicated the results of the imaging.  (A.R. 604.)

King did not alter Plaintiff's medication at her February 26, 2015, appointment.  (A.R. 608.)  Notes indicate that she had recently fallen and injured her leg, and King suspected that she may have osteoporosis.  (A.R. 608.)  King noted that imaging performed of Plaintiff's spine indicated evidence of facet disease and degenerative disc disease, but that the amount of lipid tissue hampered the results.  (A.R. 608.)

### b.    Sandi M. Alden, LCPC, LAC

Alden is a licensed clinical professional counselor who treated Plaintiff for anxiety on July 9, 2013, at the request of Dr. Westmark.  (A.R. 446.)  Alden assessed Plaintiff as suffering from panic disorder with agoraphobia, and generalized anxiety disorder.  (A.R. 447.)  Plaintiff denied a referral for psychotherapy and declined a follow-up appointment.  (A.R. 447.)

### 3.    Non-Examining Physician Evidence

### a.    David Jordan, MD

Dr. Jordan reviewed Plaintiff's medical records, but did not examine her, and did not testify at the hearing.  He issued an opinion on October 2, 2013.  (A.R. 85-94.)  Dr. Jordan opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently.  (A.R. 91.)  Dr. Jordan found Plaintiff can stand or walk for 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour work day, provided she periodically alternates sitting and standing to relieve pain and discomfort.  (A.R. 91.)  Dr. Jordan also stated Plaintiff can perform unlimited pushing/pulling, except as limited for lift and/or carry; frequently climb ramps/stairs, balance, kneel, crouch, and crawl; and occasionally climb ladders/ropes/scaffolds and stoop.  (A.R. 91-92.)  He noted the absence of any medical opinion he would need to reconcile.  (A.R. 92.)  He ultimately concluded

that Plaintiff is not disabled.  (A.R. 93.)

### b.     Marsha McFarland, Ph.D.

Dr. McFarland reviewed Plaintiff's medical and mental health records, but did not examine her, and did not testify at the hearing.  She issued an opinion on October 2, 2013.  (A.R. 85-94.)  Dr. McFarland assessed Plaintiff as suffering from affective disorders and anxiety-related disorders.  (A.R. 89.)  Dr. McFarland determined Plaintiff has mild restriction of activities of daily living; mild difficulties in maintaining social functioning and concentration, persistence, or pace; and no repeated episodes of decompensation.  (A.R. 89.)  Dr. McFarland concluded that while Plaintiff suffers from chronic anxiety, any resulting impairment is non-severe.  (A.R. 89.)  She noted that Plaintiff's depression did not increase following Prozac, and that Plaintiff has declined counseling referrals. (A.R. 89.)

### c.     Ronald Hull, M.D., and Robert Bateen, Ph.D.

Dr. Ronald Hull and Dr. Robert Bateen reviewed Plaintiff's records at the reconsideration phase, and affirmed the findings of Dr. Jordan and Dr. McFarland. (A.R. 107-117.)  There are no significant departures from the earlier reviews.

*//*

## C.    The ALJ's Findings

The ALJ followed the five-step sequential evaluation process in considering

Plaintiff's claim.  First, the ALJ found that Plaintiff had not engaged in substantial

gainful activity since November 12, 2012.  (A.R. 17-18.)  Second, the ALJ found

that Plaintiff has the following severe impairments: "obesity, fibromyalgia with

myofascial pain, and degenerative disc disease of the cervical and lumbar spine."

(A.R. 18-22)  Third, the ALJ found that Plaintiff does not have an impairment or

combination of impairments that meets or medically equals any one of the

impairments in the Listing of Impairments.  (A.R. 22-23.)  Fourth, the ALJ stated

Plaintiff has the residual functional capacity ("RFC") to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)
> as follows: she can lift, carry, push, and pull ten pounds frequently and
> twenty pounds occasionally; can walk and stand for six hours in an
> eight-hour workday; can sit for six hours in an eight-hour workday; may
> change positions during normal work breaks; can frequently climb
> ramps and stairs, balance, kneel, crouch, and crawl; can occasionally
> stoop and climb ladders, ropes, and scaffolds; should avoid
> concentrated exposure to extreme cold, vibration, fumes, odors, dusts,
> gases, poor ventilation, and work hazards including uneven surfaces,
> unprotected heights, and dangerous machinery.

(A.R. 23-32.)

The ALJ next found that Plaintiff is able to perform the past relevant work

of ward clerk, in addition to being able to perform the requirements of

representative occupations such as telephone answering service operator,

appointment clerk, and personnel scheduler.  (A.R. 32-34.)  Thus, the ALJ found

that Plaintiff is not disabled.  (A.R. 34.)

## IV.  DISCUSSION

Plaintiff argues that the ALJ erred by failing to provide specific germane

reasons for discounting her credibility, erroneously discounting the opinions of

treating physicians and other source medical providers, erroneously ignoring

depression, panic attacks, and anxiety as impairments, and failing to include all

impairments in the hypothetical to the vocational expert.

The Commissioner argues the ALJ reasonably found that Plaintiff's

activities were inconsistent with her alleged limitations, and that objective medical

evidence contradicted Plaintiff's statements concerning her symptoms and

limitations.  The Commissioner further argues the ALJ properly determined

Plaintiff's severe impairments.

### A.  The ALJ's Credibility Determination

Plaintiff argues that the ALJ's credibility determination was erroneous

because the ALJ made only a general credibility finding without providing clear

and convincing reasons for rejecting her testimony.  Plaintiff further argues that her

testimony was fully supported by the objective medical evidence.  The

Commissioner counters that the ALJ properly evaluated Plaintiff's credibility.

The credibility of a claimant's testimony is analyzed in two steps. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective evidence of an impairment or impairments that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* Second, if the claimant meets the first step, and there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if she provides "specific, clear and convincing reasons" for doing so. *Id.*

"In order for the ALJ to find [the claimant's] testimony unreliable, the ALJ must make 'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'" *Turner v. Commissioner of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Reddick*, 157 F.3d at 722 (quoting *Lester*, 81 F.3d at 834). The clear and convincing standard "is not an easy requirement to meet: '[It] is the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014).

Here, the first step of the credibility analysis is not at issue. The ALJ determined that Plaintiff's medically determinable impairments could reasonably

be expected to cause her symptoms, and there is no argument that Plaintiff is malingering. Therefore, the ALJ was required to cite specific, clear and convincing reasons for rejecting Plaintiff's subjective testimony about the severity of her impairments. The Court finds the ALJ failed to so.

The ALJ provided several reasons for not fully crediting Plaintiff's testimony regarding the severity of her symptoms. First, the ALJ found that Plaintiff's alleged limitations were not consistent with the medical evidence. Specifically, the ALJ found that Plaintiff often was observed to be in no acute or apparent distress; that multiple physical examinations were normal; that there is limited objective evidence regarding impairment to Plaintiff's hands; that treatment notes indicate full strength in her upper extremities; and that at least one of Plaintiff's providers believed her to be exaggerating her pain. (A.R. 29-30.) Additionally, the ALJ pointed to records indicating that Plaintiff's medications allowed her to maintain independent living status, ambulate in the community, and manage her household, and that she told a provider in 2015 that she felt that her pain was well-managed with medication. (A.R. 30.) The Court finds these observations are supported in the record.

But there are several pertinent pieces of testimony that the ALJ did not mention, nor cite specific, clear, and convincing reasons for rejecting. For

example, the ALJ did not discuss Plaintiff's testimony that her feet swell and that she is frequently forced to lay down with her feet about her heart.  (*See* A.R. 65-66)  That testimony is pertinent because the VE indicated that such a requirement would eliminate the jobs he proposed.  (A.R. 80.)  The ALJ also did not discuss Plaintiff's testimony regarding her memory issues, which the VE indicated also may be disqualifying depending on the employer.  (A.R. 64-65, 80.)  Finally, the ALJ did not discuss at all whether she found Plaintiff's testimony credible with respect to her claims of depression and panic attacks, the latter of which the VE indicated would be disqualifying if they forced Plaintiff to be off-task for a half-hour or more.  (A.R. 29-30, 79-80.)

In *Brown-Hunter*, 806 F.3d at 489, the Ninth Circuit held an ALJ fell short of providing specific, clear, and convincing reasons for rejecting a claimant's testimony by merely reciting the medical evidence in support of his RFC finding. The Court explained that summarizing the medical record "is not the same as providing clear and convincing *reasons* for finding the claimant's symptom testimony not credible." *Id.* at 494 (emphasis in original).  The Ninth Circuit also emphasized that the ALJ must identify specifically *which* of the claimant's statements she found not credible and *which* evidence contradicted that testimony. *Id.* at 493-494.

Without the required specificity, the Court cannot meaningfully review the ALJ's decision to determine whether the ALJ arbitrarily discredited Plaintiff's testimony. *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) ("[T]he ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."); *Brown-Hunter*, 806 F.3d at 492 ("[A]lthough we will not fault the agency merely for explaining its decision with 'less than ideal clarity,' . . . we still demand that the agency set forth the reasoning behind its decision in a way that allows for meaningful review.") (citation omitted).

Because the ALJ failed to point to the specific parts of Plaintiff's testimony she found not credible, and failed to link that testimony to particular parts of the record, the ALJ erred. *Brown-Hunter*, 806 F.3d at 494. As such, the Court finds that the ALJ's credibility finding is not supported by specific, clear, and convincing reasons with respect to Plaintiff's alleged need to elevate her feet, Plaintiff's memory problems, and Plaintiff's depression and panic attacks. The Court further finds that the error is not harmless.

An ALJ's error is harmless if it is "inconsequential to the ultimate nondisability determination." *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008). Here, the VE testified that if Plaintiff's testimony

were fully credited on these points, the proposed jobs likely would be eliminated. (A.R. 79-80.)  Accordingly, a proper determination of Plaintiff's credibility may affect the outcome of Plaintiff's disability claim.

### B.  Treating Physician and Other Medical Source Evidence

Plaintiff argues the ALJ failed to give proper weight to the opinions of Dr. Yorgason, Dr. Stenseth, Dr. Burke, Dr. Westmark, and Dr. Paczkoswki, as well as non-physicians King and Alden.  The Commissioner responds that the ALJ gave proper weight to these providers' opinions.  The Court finds the ALJ did not err with respect to Plaintiff's treating providers.

With the exception of King, who opined that Plaintiff is incapable of physical work (*see, e.g.,* A.R. 592), Plaintiff does not point to an opinion from any provider that Plaintiff is incapable of working.  The ALJ explicitly considered King's opinion on this point, and, as the ALJ noted, it "is not inconsistent with the [RFC]."  (A.R. 30.)  Beyond that opinion, the only evidence the ALJ had to consider was the various providers' treatment notes, which are discussed at length in the ALJ's decision.

Moreover, treatment notes, in general, do not constitute medical opinions. *See* 20 C.F.R. § 416.927(a)(2) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your

impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.")  Because the providers did not offer opinions regarding Plaintiff's limitations or ability to work, their treatment notes do not constitute medical opinions the ALJ must weigh. *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223 (9th Cir. 2010) (holding that where a physician's report did not assign any specific limitations or opinions regarding the claimant's ability to work, "the ALJ did not need to provide 'clear and convincing reasons' for rejecting [the] report because the ALJ did not reject any of [the report's] conclusions.").

Accordingly, the ALJ did not err by failing to assign a weight to the treatment notes of Dr. Yorgason, Dr. Stenseth, Dr. Burke, Dr. Westmark, Dr. Paczkoswki, King, or Alden.

### C.     Consideration of Depression as an Impairment

Plaintiff next argues the ALJ failed to consider depression, panic attacks, and anxiety as severe impairments.  The Commissioner asserts the ALJ properly determined that Plaintiff's mental impairments were mild.

Under step two of the sequential evaluation process, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments.  20 C.F.R 404.1520(c); 416.920.  At the step two inquiry, "the ALJ

must consider the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each alone was sufficiently severe." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996)). The Social Security Act defines a "severe" impairment as one "which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). "An impairment or combination of impairments may be found 'not severe *only* if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting *Smolen*, 80 F.3d at 1290). The step two "inquiry is a de minimis screening device [used] to dispose of groundless claims," *Smolen*, 80 F.3d at 1290.

Here, the ALJ conducted a fairly thorough analysis at step two regarding the severity of Plaintiff's medically determinable mental impairments. (A.R. 20-22.) The ALJ discussed each of the four broad functional areas for evaluating mental disorders, known as the "paragraph B" criteria. (*Id.*) The ALJ concluded that Plaintiff suffered from mild limitations of the first three functional areas, and found no episodes of decompensation which have been of extended duration. (*Id.*)

The Court recognizes that Plaintiff's depression was consistently diagnosed as "severe" or "moderately severe" (*see, e.g.*, A.R. 544-574), and the ALJ did not

discuss those findings at all in her decision. However, Plaintiff does not point to any authority that would suggest that a clinical diagnosis of "severe" depression necessitates a finding of "severe" within the meaning of 20 C.F.R. § 404.1520(c). Accordingly, the ALJ's finding of non-severity was supported by substantial evidence.

A finding of non-severity at step two does not, however, relieve the ALJ from further considering an impairment. At step four of the sequential evaluation process, the AJL must determine the claimant's RFC. 20 C.F.R. § 404.1545(a)(5)(i). The RFC represents the most the claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R. § 404.1545(a)(1). In assessing the RFC, the ALJ must consider the "limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may – when considered with limitations or restrictions due to other impairments – be critical to the outcome of a claim." SSR 96-8P, 1996 WL 374184, *5 (S.S.A. July 2, 1996). *See also* 20 C.F.R. § 404.1545(e).

Accordingly, even if Plaintiff's mental health impairments are non-severe, the ALJ still had a responsibility to consider them within the context of the RFC, to

ensure that they are not "critical to the outcome of [the] claim" "when considered with limitations or restrictions due to other impairments." The ALJ recognizes this by stating "[t]he limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment," and that the "residual functional capacity assessment used at steps 4 and 5 . . . requires a more detailed assessment. . . ." (A.R. 26.) Rather than providing a more detailed assessment in connection with the residual function assessment, however, the ALJ stated only that "the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." (A.R. 26.) The ALJ did not explain how she determined Plaintiff's depression, anxiety, and panic attacks would not lead to RFC limitations when considered together with Plaintiff's other severe impairments. When a claimant's impairments are supported by substantial evidence in the record, the ALJ must either consider them in the RFC or cite reasons for excluding them. *See Robbins v. Social Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006). The ALJ may not simply ignore them. *Id.* (stating the ALJ "is not free to disregard properly supported limitations.").

Therefore, although the ALJ found Plaintiff's mental impairments were not severe, the ALJ was still required to consider whether any limiting effects of her depression, anxiety and PTSD, in combination with her other severe impairments,

affected her ability to work. The ALJ must also address other non-severe impairments in the RFC assessment which may affect her ability to work, such as her memory impairment, and the necessity that she frequently elevate her feet to alleviate swelling.

Accordingly, the Court finds the ALJ erred by failing to consider Plaintiff's non-severe impairments in the RFC or explaining why she excluded them. The Court further finds that the error was not harmless. It is possible Plaintiff's mental impairments and other non-severe impairments, when considered together with her other limitations or restrictions, may be critical to the outcome of her claim. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008).

### D. Failure to Incorporate Impairments into Hypothetical Questions Posed to the Vocational Expert.

Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). "The testimony of a vocational expert 'is valuable only to the extent that it is supported by medical evidence.'" *Magallanes*, 881 F.2d 747, 756 (9th Cir. 189) (quoting *Sample*, 694 F.2d 639, 644 (9th Cir. 1982)). If the assumptions in the hypothetical are not supported by the record, then the vocational expert's opinion that the claimant has a residual working capacity has no evidentiary value. *Embrey*, 849 F.2d at 422. *See also Shumaker v. Astrue*, 657

F.Supp.2d 1178, 1180 (D. Mont. 2009) (holding where the ALJ's hypothetical questions did not accurately reflect the claimant's restrictions established by the medical record, "the ALJ's determination that [the claimant] could perform other work existing in the national economy does not rest on substantial evidence").

As discussed above, the Court has determined the ALJ failed to adequately consider Plaintiff's limitations caused by her mental impairments and other non-severe impairments, and did not adequately support her reasons for discrediting Plaintiff's testimony. Accordingly, these errors may have infected the hypothetical that the ALJ relied on, and in turn, the ALJ's determination that Plaintiff could perform her past relevant work. Therefore, the Court finds the ALJ's determination at step four is not supported by substantial evidence.

## V.    REMAND OR REVERSAL

Plaintiff asks the Court to remand this case for further proceedings. "[T]he decision whether to remand a case for additional evidence or simply to award benefits is within the discretion of the court." *Reddick v. Chater*, 157 F.3d at 728. If the ALJ's decision "is not supported by the record, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004)). "If additional

proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded. Where, however, a rehearing would simply delay receipt of benefits, reversal [and an award of benefits] is appropriate." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).

The Court finds remand for further proceedings is appropriate. On remand, the ALJ shall incorporate all of the limitations related to Plaintiff's mental impairments in the RFC, or cite reasons for excluding them; the ALJ's analysis must address Dr. Stenseth's persistent finding of "severe" depression. In addition, the ALJ shall reconsider Plaintiff's credibility regarding her mental impairments, her memory issues, and the requirement that she elevate her feet about her heart to alleviate foot swelling. Finally, the ALJ shall reassess whether Plaintiff can perform her past work or other work in the national economy based upon a hypothetical to the vocational expert that incorporates of all the limitations supported by the record.

//

//

//

## VI.    CONCLUSION

Based on the foregoing findings, the Court orders that the Commissioner's decision be **REVERSED** and this matter be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

DATED this 29th day of March, 2018.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge